**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**HIEU VU,**<br><br>　　　　**Defendant.** | **Crim. Action No. 1:26CR55** |

**MEMORANDUM IN AID OF SENTENCING**

On July 30, 2026, Hieu Trung Vu will appear before the Court to be sentenced for unlawful possession of a firearm and possession with intent to distribute narcotics. In determining the sentence, Mr. Vu respectfully asks that the Court consider the following circumstances: First, Mr. Vu survived an extraordinarily difficult childhood marked by repeated physical and emotional abuse at the hands of adults entrusted with his care, parental neglect, and time in foster care. Second, Mr. Vu's criminal history category substantially overstates the seriousness of his record, placing him in Criminal History Category VI largely because of nonviolent drug possession offenses. Third, and most significantly, the sentence imposed by this Court will not be the end of Mr. Vu's punishment. Upon completion of this Court's sentence, he will be transferred to the custody of Immigration and Customs Enforcement ("ICE") and deported to a country he last saw as a small child—a country where he has no family, no meaningful ties, and no support system. Due to Mr. Vu's upbringing, the nature of his prior convictions, and his inevitable removal from the United States, a sentence of imprisonment significantly below the guideline range achieves the goals of sentencing.

## I.    The sentencing factors support the requested sentence.

A sentence of no more than 24 months in Bureau of Prisons custody is more than adequate to address all of the factors this Court must consider under the sentencing statute. 18 U.S.C. § 3553(a). As the Court is aware, the guidelines are only one factor among the co-equal factors set forth in 18 U.S.C. § 3553(a), and after evaluating all of the factors, a sentencing court may find that "the guidelines sentence itself fails properly to reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005). This is the type of case that warrants a different sentence.

### A.  Mr. Vu's history and characteristics support significant variance.

Mr. Vu's story and eventual journey to the United States began long before he ever set foot on American soil. It traces back to the U.S. involvement in the Vietnam War, where a brief relationship between an American soldier and Leo's grandmother led to the birth of Leo's mother, Thanh Hang Pham, an Amerasian child. Years later, under the Amerasian Homecoming Act, enacted to provide immigration opportunities for children fathered by U.S. servicemembers during the war, Mr. Vu's mother was able to immigrate to the U.S. with her father, Mr. Vu, and his sister. Under the Act, Mr. Vu's mother immediately received lawful permanent resident status (a green card).[1]

While many immigrants come to this country after experiencing hardships and continue to face challenges, the adversity Mr. Vu experienced extends far beyond these already formidable challenges. He has experienced more trauma than we are built to endure. His childhood is not offered as an excuse or the direct cause of his conduct, but it is a significant factor that cannot be

---

[1] Amerasian Homecoming Act of 1987, Pub. L. No. 100-202, § 584, 101 Stat. 1329 (1987).

ignored on the path that led Mr. Vu here today

Much of what the defense learned about Mr. Vu's life comes from child welfare and court records, from Mr. Vu himself, and his mother, Ms. Pham. Ms. Pham wanted to share her story and her son's story with the Court in her own words. She felt more comfortable speaking in a video, which the defense has submitted to chambers as Exhibit 1.

### i.        In Mr. Vu's early childhood, the only constants were change and loss.

Mr. Vu prefers to be called Leo because it is what his grandmother called him before she died. Born in 1988, Leo remembers little about his life in Vietnam before he moved to America at age eight. He remembers missing his mother who often left him with his grandfather for long periods of time in search of work. He remembers that his father was barely in and out of his life. He remembers being poor and being beaten by his grandfather and his grandfather's girlfriend. He remembers his kind and loving grandmother, and he remembers discovering her body after she took her own life.

Shortly after his grandmother's suicide, in 1997, Leo's mother, Ms. Pham, decided to take advantage of the newly enacted immigration law that permitted her to become a lawful permanent resident and immigrated to the U.S. with her father, Leo, and his three-year-old sister Aly. Leo's father remained in Vietnam. Shortly after they arrived in the U.S, Ms. Pham learned that Leo's father had a baby with another woman in Vietnam and the couple formally divorced. Ms. Pham settled the family in Virginia where there was a large Vietnamese community and tried to start anew.

Upon arriving in Virginia, Leo attended school and did his best to learn the academic curriculum while also learning English, which he had not learned in Vietnam. Leo's mother worked around the clock. She also did not speak English and after attending English classes in the

morning, she took any job she could find. She often took jobs cleaning office buildings at night, packing a blanket for Leo and Aly to sleep while she cleaned. Sometimes the young family would not leave cleaning jobs until almost dawn. Eventually, Leo's mother began working at nail salons. She worked long hours and seven days a week as a nail technician. When reflecting on her son's life, Ms. Pham said that as a child and teenager, Leo was alone almost all of the time.

About a year after they arrived, Ms. Pham started dating and invited a man named Klaus Lamers to live with her and her two young children. On paper, Klaus checked all of the right boxes. He was a Veteran, having served in the U.S. Army from 1988 to 1992. He had a good job as a mechanic, and he appeared willing and able to help Ms. Pham build her life in the U.S. Ms. Pham mistakenly thought he could serve as a father figure to Leo and Aly. But after about a year, Klaus's mental health issues manifested, and he became increasingly physically and verbally abusive to Leo and Aly. Leo recalls that Klaus required instant obedience, often demanding impossible levels of discipline of the children, and viciously beating them when they inevitably fell short. Apart from the physical abuse, Klaus also withheld food from Leo and Aly as a form of punishment. Leo still vividly remembers the hunger and how much he looked forward to going to school because it was away from Klaus and a place where he and Aly were always fed. During this period, the children's grandfather would come over, ostensibly to help Klaus while Ms. Vu was working, but instead of protecting the children, he also beat the children.

4

Another entry from a visit reads:



███████████ Leo and Aly moved back in with his mother.[2]

At first, life back with his mother was tolerable. She and Klaus were no longer together, and Leo and Aly reunited with their baby sister, Laura. Things changed when Leo's mother began another romantic relationship, this time with Bac. Unlike the physical abuse Klaus inflicted, Bac chose psychological abuse. He would make a show of liking Leo and Aly in front of their mother, but when she was away at work, he was cruel to the children. Bac did not work during the day, so most days he stayed home with Leo, Aly, Laura, and other neighborhood children who Leo babysat. When Leo's mother returned home from a long day at work, Bac made up stories that painted Leo and Aly in a negative light, accusing Leo of being untrustworthy and unable to care for Laura, their baby sister that Leo adored. Leo remembers losing interest in school during this time. School became another burden—something that no longer seemed to matter or promise a better life. He began to act out in school and at home. Leo does not minimize his conduct during this period. Looking back, he understands that he began to act out because of how his mother's boyfriend treated him and his sister, and because he was immature.

It is significant that when Leo started acting out and getting in trouble, he was a teenage boy. The Court is likely aware of the scientific studies that show that a teenager's brain is not fully developed. During the teenage years, the brain and limbic system are overstimulated by sex hormones such as testosterone, while the prefrontal cortex is still immature and undergoing extensive reorganization.[3] The imbalance and inconsistent coordination between these two areas of the brain, which persists well into the mid-20s, makes young people more prone to risky

---

[2] *Foster Care*, Va. Dep't of Soc. Servs., https://www.dss.virginia.gov/supporting-families/foster-care/ (Highlighting Virginia as a "kin-first" state, meaning children are placed with relatives or close family friends whenever possible.).

[3] *See* Laurence Steinberg, Age of Opportunity: Lessons from the New Science of Adolescence 69–72 (2014); Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 451–55 (2013).

behavior and less capable of making rational decisions when they are emotionally aroused.[4] Anyone who has spent time around teenagers hardly needs the scientific studies to understand that adolescence is a uniquely vulnerable stage of development—one requiring adults to provide guidance, structure, love and protection. Leo was deprived of these essential supports and his record reflects it. During his junior year of high school, he used Bac's car without permission, was arrested, and sent to juvenile detention. A redacted note in the social services record reflects this result:



At this point, it is clear that social services had shifted from providing support to Leo to treating him as a matter for the criminal legal system. Because he was in trouble with school and involved in the juvenile system, he never applied to become a naturalized citizen, a failure that haunts Leo and his mother to this day. Meanwhile, Leo's mother and his sisters are all naturalized citizens. Despite these setbacks, Leo obtained his G.E.D. Upon release from juvenile detention, he moved back in with his mother with one goal: successfully complete probation and take advantage of a fresh start.

### ii. As a young adult, Leo tried to build the family and stability his childhood never provided him.

Leo not only successfully completed juvenile probation, but he also secured stable work, met the mother of his children, Michelle, and started a family. Michelle and Leo met shortly after his release from juvenile detention. She worked as a nail technician and taught Leo how to make a living as a nail tech and manage a nail salon, two things Leo did successfully for almost eight

---

[4] STEINBERG at 77.

years. Determined to create the family he did not have and to be the father he never knew, Leo and Michelle started a family of their own, a son, Aidan, and a daughter, Adelyn. After the birth of Adelyn, Michelle experienced severe postpartum depression. Leo, unfamiliar with postpartum depression at the time, remained steadfast and committed to Michelle, working long hours to support their family and provide her the care she required. Ultimately, Michelle decided she no longer wanted to be with Leo, and after eleven years, the couple split.

Unwavering in his desire to be a good father and provider, Leo moved to Lusby, Maryland, where he managed a nail salon, working hard to support himself, Michelle, and their children. Shortly after he moved, Michelle asked Leo to move back to Virginia with her and their children because she wanted to try again, wanted to try and be a family again. Leo quit his job, broke his lease, and moved back to Virginia, only for Michelle to tell him she had changed her mind and no longer wanted anything to do with him romantically.

### iii.     Leo used drugs to cope and spiraled into full-fledged addiction.

His breakup with Michelle, more than almost any part of his life, is what Leo calls the turning point. He had uprooted his life in Maryland in hopes he might actually achieve the one thing he truly wanted: a family of his own and now he could not do that. As Leo remembers it, he "blew up." Without a place to stay, without a job, and without anything to work towards, he entered a major depression. Compounding this, he did not understand how to use community resources to obtain legal medication, and no one showed him how to get help. His struggle with substance abuse is reflected in his arrests and convictions for drug possession offenses.

Leo continued to spiral, using drugs to numb his emotional pain until his arrest for drug possession in 2020 and conviction in 2022. Upon release from his sentence and an ICE detainer in 2024, Leo felt optimistic about his future. He spent a year or more applying to jobs, any and

everything he could, with no luck. Despite not obtaining work, Leo passed all of his drug tests and dutifully complied with probation and mandated ICE check-ins for one year. Leo was hopeful he could stay out and try to find an immigration lawyer to help him. But in 2025, ICE agents posing as FBI agents started showing up at mother's house asking after Leo. The political climate at the time was such that Leo believed his next check-in with his probation officer would result in him being turned over to ICE and disappeared, so Leo stopped showing up for his probation check-ins. On May 5, 2025, the Fairfax County judge issued a bench warrant. PSR ¶ 50. A probation violation in Fairfax County remains pending.

### B. The nature and circumstances of the offense

Just prior to his December 4, 2025, arrest in the instant case, Leo met the complainant through a mutual friend. The complainant regularly used fentanyl and while Leo had used other drugs, he had not tried fentanyl before meeting the complainant. He quickly became addicted and the two began using together constantly. The details surrounding the December 2025 incident are unclear at best. The complainant called the police around 5 A.M. and accused Leo of having drugs and firearm. When police arrived, the complainant gave a fake name, fake date of birth, and fake driver's license, provided a statement to law enforcement, and received medical care. On December 5, 2024, she was arrested for shoplifting in Maryland. Leo was detained and later arrested and provided a different narrative to the police. During the execution of a search warrant, officers discovered a tan backpack containing two handguns and a Coach bag with an assortment of what was later determined to be narcotics and drug paraphernalia. Also in the Coach bag was a Chime card[5] in the name of Hieu Vu.

---

[5] Chime Cards function as credit cards and bank cards with the dominant Chime Card user making $35k-$65k a year. Most Chime Card users are considered "credit builders" and work in the gig economy at places like Uber and DoorDash. Jay Mokashi and Mulenga Agley, The Playbook that

Just as he has accepted responsibility for other poor decisions he has made, Leo takes full responsibility for possessing an unlawful firearm and drugs, and he regrets his involvement with the complainant. Today, he faces removal to a country with which he has no meaningful ties. Leo is under no illusions about what lies ahead. He knows how difficult it will be to build a life in Vietnam, where he has no friends, no family that he knows of, and no certainty about where he will find employment. Most of all, he is devastated to leave behind his children, his sisters, and his mother.

**C. Mr. Vu's criminal history category overstates his record and inflates his guideline range.**

Past iterations of the Sentencing Guidelines recognized that, where "the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," a below-Guidelines sentence may be warranted. *U.S. Sentencing Guidelines Manual* (2025) § 4A1.3 (prior to the 2024 amendments). Although the recent amendments removed the specific downward departure provision, the same considerations support a downward variance under 18 U.S.C. § 3553(a). Here, Mr. Vu's criminal history score of 12 substantially over-represents both the seriousness of his criminal history and his risk of recidivism. None of his criminal history points derive from crimes of violence. Instead, the majority stem from nonviolent possessory drug offenses and offenses related to his use of false identification Specifically, Mr. Vu received two criminal history points for drug possession offenses and another three points for with intent to distribute. PSR ¶ ¶ ¶ 42, 45, 50. He scored an additional two points for sale of marijuana and another point for possessing marijuana.[6] PSR ¶ ¶

---

Fueled 12+ Million Users for Chime; Growthcurve; May 26, 2025, 2:44 PM; https://growthcurve.co/the-playbook-that-fueled-12-million-users-for-chime.

[6] Possession of marijuana has since been decriminalized in Virginia. Virginia Code § 4.1-1100

44, 46. Thus, a total of 7 points derive from nonviolent drug possession offenses. Mr. Vu also received one point for offenses involving use of a fake identification card and petit larceny, PSR ¶ 43, and another point for driving on a suspended license. PSR ¶ 47. Finally, he received three points for possession of a firearm by a felon and credit card larceny. PSR ¶ 49. Although Mr. Vu has had numerous contacts with law enforcement, none of his offenses involved violence or use of threat or force. Instead, his offenses reflect someone struggling with substance abuse and, at times, using a false identification out of fear of the immigration consequences of identifying himself to law enforcement.

Mr. Vu's offenses do not reflect the type of dangerous and repeat criminal conduct that Criminal History Category VI is intended to capture. Criminal History Category VI substantially overstates both the seriousness of Mr. Vu's criminal history and the likelihood that he will commit future crimes, especially here, where he will be deported. The Court should instead begin its analysis using the criminal history category contemplated by the parties in the plea agreement and treat the corresponding advisory guidelines range as the appropriate starting point. The Court should then impose a further downward variance based on the additional sentencing considerations set forth in 18 U.S.C. § 3553(a).

### D. A short sentence, followed by Mr. Vu's prompt removal to Vietnam, is sufficient but not greater than necessary to achieve the goals of sentencing.

Mr. Vu does not ask this Court to spare him punishment. He asks the Court to recognize that the most severe punishment he faces — permanent banishment from the country where he has lived since he was a small boy, and from his mother, his sisters, and his two American children — is already certain. The Supreme Court has long recognized that deportation is a "particularly severe 'penalty,'" intimately tied to the criminal process and, for many defendants, more consequential than any term of imprisonment. *See Padilla v. Kentucky*, 559 U.S. 356, 365–66 (2010). For Mr.

Vu, removal is not a collateral afterthought; it is the central fact of his sentence. Counsel respectfully submits that a well below-guidelines sentence combined with his eventual transfer to immigration custody and removal to Vietnam, is sufficient but not greater than necessary under 18 U.S.C. § 3553(a).

A lengthy period of incarceration in Bureau of Prisons (BOP) custody would serve none of the statutory purposes of sentencing. Specific deterrence and protection of the public are fully accomplished by a shorter term of imprisonment followed by removal as Mr. Vu will not be in the United States. Even if, improbably, the immigration laws were to change and he can remain in this country, his non-violent record shows that a lengthy period of incarceration is not needed to protect the public. Nor would a longer term of imprisonment advance his rehabilitation. As a noncitizen subject to an immigration detainer, Mr. Vu will be categorically excluded from the BOP programming and he will be ineligible for early-release credit through residential drug treatment, for placement in a halfway house or home confinement, and for minimum-security designation.[7] He will serve more punishing time than a similarly situated citizen, only to be sent to ICE custody and deported at the end of it. A sentence of several years would therefore function purely as warehousing at taxpayer expense: years of delay— caged in one cell after another—between today and his eventual removal.

The District of Columbia Circuit has recognized that a departure may be appropriate for non-citizens without lawful status in the United States because the Bureau of Prisons' regulations provide for differential treatment for these inmates. *See United States v. Smith*, 27 F.3d 649, 655-56 (D.C. Cir. 1994) (stating that departure "may be appropriate where the defendant's status as a

---

[7] FIRST STEP Act, H.R. 5682, 115th Cong. §3632(d)(4)(B)(iii) (2018)(stating in plain terms that prisoners who are "deportable alien[s] under the immigration laws (as such term is defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)" may not earn time credits under an evidence-based recidivism reduction program.)

deportable alien is likely to cause a fortuitous increase in the severity of his sentence"). Additionally, courts in this district have routinely reduced sentences on this basis. *See, e.g.*, *United States v. Rodriguez*, 676 F.3d 183, 192 (D.C. Cir. 2012) (explaining that "[t]he [district] court itself noted that it "normally" reduces the sentence of a deportable alien by six months under *Smith*").

The Guidelines themselves contemplate this situation. Section 5D1.1(c) provides that a court "ordinarily should not impose a term of supervised release" where the defendant is a deportable alien who likely will be removed after imprisonment. The same logic extends to the term of imprisonment: where removal is certain, the marginal value of additional custody diminishes to the vanishing point, while its costs to Mr. Vu, his children, and the public continue to accrue.

Mr. Vu's request is not an attempt to evade consequences but to accept the gravest one more quickly. He will arrive in Vietnam without family, without friends, without certain employment, and without having lived there since early childhood. He does not minimize that reality; he chooses it, because he is ready to stop cycling through American jails and start over in the only way presently available to him.

                                                Respectfully submitted,

                                                A.J. KRAMER
                                                FEDERAL PUBLIC DEFENDER

                                                _____/s/_____
                                                Elizabeth Mullin
                                                Assistant Federal Public Defender
                                                625 Indiana Avenue, N.W., Suite 550
                                                Washington, D.C.  20004
                                                (202) 208-7500
                                                Elizabeth_Mullin@fd.org

                                    13